IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:24CR252 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| RONALD TOUCHARD, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

Now comes the United States of America, by and through the undersigned counsel, and

hereby submits this Memorandum in aid of sentencing.  The Government respectfully submits

that a sentence within advisory Guidelines range of Level 23, Criminal History Category II, as

contemplated by the plea agreement, is the appropriate range of sentence that will be sufficient

but not greater than that needed under the factors enumerated in 18 U.S.C. § 3553(a).

I.    **BACKGROUND**

Defendant Touchard and the Government entered a plea agreement before the court in

which both parties agreed that his Guidelines Range would be no less than 20 and no greater than

25.   In particular, the parties agreed and stipulated to guidelines ranges as follow:

| Count 1 – Conspiracy to Commit Securities Fraud, 18 U.S.C. § 371 | | |
|---|---|---|
| Base offense level | 7[1] | § 2B1.1(a)(1)<br>§ 2X1.1(a) |
| Loss: $1,500,000 - $3,500,000 (Approximately $2,000,000) | +16 | § 2B1.1(b)(1)(I) |
| Ten or more victims | +2 | § 2B1.1(b)(2)(A)(i) |

---

[1] The PSR prepared in this matter considers the base offense level to be 6, due to the fact that the crime of conviction, 18 USC 371, has a statutory maximum of 60 months.  The government disagrees as the conviction is for a conspiracy to commit securities fraud, which carries a maximum punishment of 20 years imprisonment and thus a base offense level of 7.

| Aggravating Role | +0-3 | § 3B1.1(b) |
|---|---|---|
| **Total Offense Level before Acceptance of Responsibility** | **25-28** | |
| Acceptance of Responsibility | -3 | § 3E1.1(a) and (b) |
| Departure for Physical Condition | -(0-2) | § 5H1.4 |
| Zero Point Offender | -(0-2) | § 4C1.1 |

The parties did not agree on whether the aggravating role enhancement or zero-point offender reduction applied and were free to argue the same. Additionally, defendant was allowed to argue to the Court that his physical condition warranted an up to two-level reduction. Accordingly, Defendant could receive reductions lowering his guidelines range to Level 18, Criminal History I, or potentially be found as high as Level 25, Criminal History II.

**II.    SENTENCING**

      A.    TOUCHARD WAS A MANAGER OR SUPERVISOR

Touchard was a manager or supervisor of an extensive fraud scheme designed for one purpose: to trick the investing public into buying shares of HQGE and then pumping up their value through fraudulent press releases so Touchard and his co-conspirators could covertly dump their own shares for a windfall. Touchard lied to investors, using boiler rooms that used mass marketing techniques to sell the HQGE stock while also hiding his and co-defendant Garcia's ownership and control in the stock. Touchard used his knowledge of the securities market and similar financial schemes to circumvent trading restrictions and directed and organized the use of an array of proxy or shell companies, an investor relation company in Europe, nominee shareholders, and attorneys to evade detection.

For example, Touchard controlled a bank account for International Stock Group (ISG), a company that held one of the only two convertible debt notes in HQGE stock (the other being Hemmingway, which was owned and controlled by co-defendant Paul Garcia). (R. 43: Final PSR, ¶9). On February 7, 2018, at Touchard's direction, ISG converted approximately $15,000

of ISG's convertible note into approximately three million shares of HQGE stock at a rate of approximately $0.005 per share. (Id.). On April 23, 2018, in a recorded call with Touchard, he noted that he planned "action" on the HQGE stock that would permit him to convert the three million in stock at a rate of $0.75 per share.  (Id., ¶10).

Three days later, Touchard stated he and his partner had complete control of HQGE stock, to include all the shares and notes in the company. (Id., ¶11).  Touchard also noted he had control over other stocks including Petlife (PTLF) and eWorld (EWRC). (Id.). On May 7, 2018, Touchard told an individual working with the FBI that he was working with Co-Conspirator 1 and using the same European investor relations group that he previously used in a separate stock promotion involving SHRV. (Id., ¶14). Touchard noted he was spending up to $1,000,000 on the stock promotion. (Id.). Touchard went on to explain that he would start promoting the stock through the investor relations firm in approximately two weeks time and that only he, Garcia and the investor relations group would be selling the HQGE stocks. (Id.). He reiterated that he and Garcia owned all the notes and all the shares in HQGE. (Id.) Touchard also noted that he provided Co-Conspirator 2 and his associates with HQGE stock approximately 10% of HQGE's stock as part of an attempt to increase liquidity in the stock, and that Co-Conspirator 2 had attempted to tout the HQGE stock in an attempt to increase the price, but that attempt failed. (Id.). Touchard then turned to Co-Conspirator 1 to use the investor relations firm to tout the HQGE stock. (Id.). The next day, Touchard and Garcia both told the FBI source that they had the "tri-fecta" which included "control of the CEO, control of the board, and control of the free-trading shares" of HQGE and another stock, ANDI. (Id., ¶15).

This control and organization is shown in a May 22, 2018, email Garcia sent to the FBI source and Co-Conspirator 1, in which he cc'd Touchard, where he noted that certain stocks to

be sold by the FBI source would be issued by Garcia and Touchard only under certain conditions including that the source would "only sale when [Co-Conspirator 1] and us indicate to do so" and provide an agreed to kickback to Garcia and Touchard. (Id., ¶17). Similar to the arrangement with the FBI source, Touchard had similar arrangements with other co-conspirators, including Co-Conspirators 2, 3, 4. This is evidenced by Touchard's June 27, 2018, conversation with the FBI source in which he admitted to providing Co-Conspirator 3 with shares to liquidate at his instructions, (id., ¶22), and later transmittals of funds from Co-Conspirator 4 for "purchases of HQGE" stock in later months. (Id., ¶26).

That Touchard played an important organizational role in the conspiracy is also shown in the concern and deference other co-conspirators had at the time of the offense.  On May 25, 2018, as the pump was set to occur, Touchard was arrested and jailed in California on state felony fraud charges for a separate real estate fraud scheme that occurred two years prior. While he was incarcerated, Co-Conspirator 1 noted that everyone in the conspiracy was nervous because Touchard was in control of everything. (Id., ¶¶ 18-19). Even after he was released from incarceration, Touchard attempted to continue the conspiracy by employing others, including Co-Conspirator 5, to pressure the FBI source to "take more paper" and serve as a nominee holder of additional stock for the conspiracy. (Id., ¶25).

1.    The conspiracy had more than five other criminal co-conspirators

As an initial matter, it is clear that Touchard engaged in a conspiracy involving at least four or more other co-conspirators.  As laid out in his factual basis for the plea agreement, Touchard agreed that he worked with the following individuals:

- Co-defendant Paul Garcia
- Co-Conspirator 1, with whom he organized a promotional scheme for HQGE to mass-distribute false information on the stock;

4

- Co-Conspirator 2, to whom he provided shares to liquidate at his direction and further attempted to manipulate trading volume for HQGE;
- Co-Conspirator 3, to whom he provided shares to liquidate at his direction;
- Co-Conspirator 4, to whom he provided shares to liquidate at his direction and who later provided funds to him based on those sales;
- Co-Conspirator 5, whom he employed to tempt the FBI source to engage in further restricted sales and schemes;
- And various nominees, including a nominee owner of ISG and CEO of HQGE;
- Individual 1 – a government source.

Without considering Individual 1, it is clear that Touchard was working in a criminal conspiracy of more than four other individuals.

### 2. Touchard organized or led others within the conspiracy

It is further clear that Touchard managed or supervised others within the conspiracy, to include: using and managing nominees to obscure his role in controlling HQGE; managing the timing and scope of the promotional scheme through Co-Conspirator 1, to include the timing of touts to increase the HQGE price; supervising the conversion of notes to HQGE shares and the subsequent allocation to co-conspirators to manipulate trading volume; providing instructions and expectations to others on when to liquidate stocks and expected payments in return; and the solicitation of others to join in the ongoing conspiracy.

### 3. Touchard's ultimate financial benefit is not dispositive

Defendant may complain that, because others in the conspiracy made more money than he did, he cannot be a manager or supervisor of the group. This argument fails for many reasons. First, as the Seventh Circuit Court of Appeals has observed, it is not uncommon for a manager to be paid no more than, or even less than, a subordinate:

> A star salesman may be paid more than the sales manager to whom he reports. A hospital's star surgeons often are paid more than the hospital's administrator, and the head coach of a college athletic team often is paid more than the athletic

> director to whom he reports. In a small firm, or a small gang, the profits may be split evenly because if one member were paid more than the others there mightn't be enough left over to induce them to remain, or because a subordinate might have specialized skills that were scarcer than the boss's skills.

*United States v. Rosales*, 716 F.3d 996, 998 (7th Cir. 2013).

The same logic holds true here, where the investor relations firm that made the bulk of profits from the scheme provided a vital and "specialized skill that [was] scarcer than the boss's skills," thus warranting a higher cut of the profits. That does not change the fact that Touchard still managed and supervised the operations, including his decision on whether and when to use the specialized investor relations firm.

The primary question in determining whether a leadership enhancement applies is not whether a particular defendant made the most money, but rather "whether the defendant exerted control over another individual." *United States v. Tanner*, 837 F.3d 596, 603 (6th Cir. 2016). The factors relevant to a leadership enhancement include whether the defendant "*exercised decisionmaking authority, recruited accomplices*, received a larger share of the profits, *was instrumental in the planning phase of the criminal venture,* or *exercised control or authority over at least one accomplice.*" *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (emphasis added) (citing *United States v. Lalonde*, 509 F.3d 750, 765–66 (6th Cir. 2007)). Importantly, "[a] district court need not find each factor in order to warrant an enhancement." *United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir. 2012) (citing *United States v. Gates*, 461 F.3d 703, 709 (6th Cir. 2006)). And relatedly, no single factor is dispositive on the matter. *Cf. United States v, Taniguchi*, 49 F. Appx. 506, 520 (6th Cir. 2002).

Here, Touchard:

- *exercised decisionmaking authority* – he decided when to engage in touts to drive prices up and in what manner (i.e., through Co-Conspirator 1 or 2);

6

- *recruited accomplices* – he recruited others, including Co-Conspirators 2, 3, 4, 5 and other individuals to serve as proxy shareholders or nominees in HQGE, ISG and other relevant companies.

- *was instrumental in the planning phase of the criminal venture* – Touchard initiated this plan,  established ISG, created the debt notes and shares of HQGE, hid his and Garcia's ownership in restricted shares of HQGE, and planned various aspects of the pump and dump scheme with Garcia.

- *exercised control or authority over at least one accomplice* – Touchard held control over ISG's accounts although the company was nominally owned by a proxy, controlled Co-Conspirator 4 who provided him returns on the dump of HQGE shares, and Co-Conspirator 5 who he used to recruit others into additional pump-and-dump schemes.

Touchard's involvement was not minimal, and the fact that he did not make as much profit as other co-conspirators does not diminish his leadership role in the conspiracy.  *See United States v. Griffith*, 781 F. Appx. 418 (6th Cir. 2019) (applying role despite equal share of profits in prison bribery and contraband scheme where defendant selected the types of contraband, instructed his girlfriend to obtain that contraband and provide it to bribed prison guard, determined the amount of the bribes that girlfriend was to pay guard, directed guard to the "drop spots" within the prison, set the prices to be paid by the other inmates, and recruited his own mother to assist with money transfers.); *United States v. Parker*, 25 F.3d 442, 445-46 (leadership role appropriate for defendant police officer who received smaller share of profits from robberies he initially conceived, for which he selected the targets, provided the weapons and information on couriers to be robbed, but did not actually participate in the robberies).

4.    Multiple Conspirators can be Leaders

Additionally, that other co-conspirators also had some roles in supervising others does not foreclose the application of this enhancement.  Application Note 4 to § 3B1.1 notes as much—"There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." Nearly every circuit has applied this section as written. *See United States v. Sexton*, 894 F.3d 787, 796 (6th Cir. 2018); *United States v. Rivera*, 51 F.4th 47, 52 (1st Cir. 2022); *United States v. Maes*, 961 F.3d 366, 378 (5th Cir. 2020); *United States v. Jones*, 792 F.3d 831, 836 (7th Cir. 2015); *United States v. Louper-Morris*, 672 F.3d 539, 565 (8th Cir. 2012); *United States v. Rivera*, 527 F.3d 891, 910 (9th Cir. 2008); *United States v. Gehrmann*, 966 F.3d 1074, 1085 (10th Cir. 2020); *United States v. Vallejo*, 297 F.3d 1154, 1169 (11th Cir. 2002); *United States v. Bras*, 483 F.3d 103, 113–14 (D.C. Cir. 2007); *see also United States v. Cameron*, 573 F.3d 179, 185 (4th Cir. 2009) (noting "it is true that more than one person may qualify as an organizer").

Accordingly, Touchard should receive a three-level leadership enhancement pursuant to § 3B1.1(b) as contemplated within the plea agreement, bringing his offense level prior to any reductions to Level 28, and to a Level 25 following the acceptance of responsibility reductions.

B.    TOUCHARD DOES NOT QUALIFY FOR A ZERO-POINT OFFENDER REDUCTION

While the parties agreed that Defendant could argue to apply the zero-point offender reduction under § 4C1.1, the parties did not agree on whether it did in fact apply.

First, for the reasons set forth above, Touchard was not an incidental or minor participant in this enterprise but was a manager or supervisor at a minimum of an extensive criminal conspiracy and is disqualified from the reduction pursuant to § 4C1.1(a)(10).

Second, this Court should not simply ignore Touchard's prior felony fraud conviction for which he was sentenced to four years incarceration. To be clear, Touchard committed two separate felony crimes. The first offense was a real estate investment fraud against a victim in California under Case No. 18HF0732 in the Superior Court of California, Newport Beach, California ("the California case"). That fraud occurred in or around June 13 to September 2, 2016, almost two years prior to the instant case, and he was arrested in that case at the end of May 2018. In the California case, he obtained three fraudulent mortgages more than $5,900,000 and on August 15, 2023, was initially sentenced and ordered to pay restitution of approximately $1,000,000 to a victim ("the 2016 victim") in California by July 1, 2024.  On November 6, 2024, because Touchard had failed to make restitution to the 2016 victim, he was resentenced in California state court to fours years incarceration. His second criminal case is the present case, which he engaged in two years after the first fraud. They are not intertwined except for the fact that Touchard is the criminal defendant in both cases. The schemes are factually and temporally separated from one another and should not be conflated. Accordingly, this 2024 conviction must be counted toward his criminal history, resulting in three points and a Criminal History Category II.

Third, even considering only his 2023 California restitution sentence, he would still receive one criminal history point pursuant to § 4A1.1(c), thus rendering him ineligible for a zero-point offender reduction under § 4C1.1(a)(1). Touchard makes no attempt to explain why this 2023 conviction is not a valid conviction, nor how it should not be counted against his criminal history score.

Finally, that Touchard was timely indicted on the federal case prior to being sentenced on the California state case is of no import. If he had his way, ostensibly to have been sentenced

federally prior to his 2023 California sentencing, then he would not have qualified for a Zero-Point Reduction under § 4C1.1 as that section, although retroactive, was not effective until November 1, 2023. His claim that he wanted to plead and be sentenced prior to being resentenced in the California case also runs contrary to the intent of the Guidelines and Section 4C1.1, which at its core is reserved for those defendants for whom this is truly their first offense. That is not the case for Touchard. Moreover, he ignores the fact that he did, in essence, already receive the benefit of being a first-time offender as reflected in his initial California restitution sentence on August 15, 2023—for which that sentencing court did not have the benefit of seeing his prior criminal history to include the present federal case. He should not receive that same benefit twice from this Court. He cannot be a first-time offender twice.

Accordingly, this Court must correctly calculate his criminal history as Category II giving full credit to his prior four-year sentence in California and further deny his motion to reduce his offense level pursuant to § 4C1.1.  Thus, Touchard remains a Level 25, Criminal History Category II, prior to additional potential reductions.

C.     THE GOVERNMENT DOES NOT OPPOSE THE COURT'S CONSIDERATION ON WHETHER TO DOWNWARD DEPART DUE TO TOUCHARD'S HEALTH REASONS

Consistent with the plea agreement, the government does not object to the Court's consideration of Touchard's health condition in determining whether a grounds for an up-to-two-level departure pursuant to § 5H1.4 exists in this matter.  Thus, Touchard may potentially be a Level 23 or Level 25, CHC II, depending on the Court's decision.

D.     THE COURT SHOULD CREDIT DEFENDANT TOUCHARD FOR TIME SPENT ON THE WRIT OF HABEAS CORPUS AD PROSEQUENDUM

As contemplated in the plea agreement, the government agrees with defendant that he should receive credit, in the form of a downward departure pursuant to § 5G1.3(d), for time

10

between December 6, 2024 (the date he was taken into federal custody from California for this case) to January 7, 2025 (the date he arrived in this district).

    E.    <u>GENERAL PURPOSES OF SENTENCING</u>

Title 18, United States Code, Section 3553(a) requires the sentencing court to consider the general purposes of sentencing, including: "the need for the sentence imposed- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Gall v. United States*, 552 U.S.38, n.6 (2007)*.* "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Id.* at 49*.* The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)).

First, the "nature and circumstances of the offense" make a Guidelines sentence appropriate due to the defendant's leadership role in this conspiracy. 18 U.S.C. § 3553(a)(1). The defendant coordinated with co-conspirators to manipulate trading volume and share pricing of fraudulent stocks and set up promotional schemes to mass-distribute false information to the securities market.  He held a central managerial role in recruiting others to act as proxies, managing the timing of press releases and stock liquidations to manipulate the market, and the use of boiler rooms to target large swaths of victims.

In addition, the crime was a serious one. This penny stock conspiracy victimized hundreds of investors, defrauding them of millions of dollars. Investors have a right to believe that the stock prices and volume data they use to guide their investment decisions is "determined

by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir.1999). They have a right to believe that press releases that inform them are legitimate, not lies made to swindle them.

Presently, the parties agree that a sentence within the properly calculated guidelines range, as contemplated by the plea agreement, is appropriate.  Here, the defendant participated in a serious offense that involved more than eight hundred victims.  There is a greater need for general deterrence for fraud schemes than other crimes, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *See, e.g., United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, *White–Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)).  A sentence within the applicable Guidelines range, which represents a strong but fair sentence by the Court, would send a strong deterrent message to both the defendant and to those who engage in similar conduct as the defendant that such crimes are serious offenses that come with appropriate consequences and promote respect for the law, and provide just punishment for the defendant.

F.    <u>RESTITUTION</u>

As agreed to in the plea agreement, and pursuant to the Mandatory Victim Restitution Act, 18 U.S.C. §§ 3663 and 3663A, the government also requests that this Court order defendant to pay $2,036,658.53 as restitution, due and payable immediately upon sentencing to the victims in this matter. The government will provide a full list of victims and current contact information to this Court at sentencing.

III.    **CONCLUSION**

For the foregoing reasons, the government submits that a sentence within the advisory guidelines range of Level 23 (assuming this Court grants his motion for a downward departure due to his physical condition), Criminal History Category II, resulting in a range of 51-60 months incarceration (as limited by the statutory maximum of 60 months for the count of conviction) is appropriate in this case.  As noted above, such sentence should ensure to provide credit to defendant for time served under the federal writ of habeas corpus ad prosequendum in this matter, and also include an order of restitution against defendant.

Respectfully submitted,

CAROL M. SKUTNIK
Acting United States Attorney

By:    /s/ Om Kakani
Om Kakani (NY: 4337705)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3756
(216) 522-2403 (facsimile)
Om.Kakani@usdoj.gov